Alex S. Madar, Esq. (SBN: 319745)
alex@madarlaw.net
**MADAR LAW CORPORATION**
630 1st Ave, Ste 219
San Diego, CA 92101
Telephone: (858) 299-5879

Michael A. VanGalio, Esq. (SBN: 314675)
michael@vangaliolaw.com
**VANGALIO LAW CORP**
4203 Genessee Ave. Ste 103 Box 163
San Diego, CA 92117
Telephone: (805) 720-3938

Andrea R. Gold (*pro hac vice to be filed*)
agold@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, Northwest, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900

Frank A. Bartela (*pro hac vice to be filed*)
fbartela@tzlegal.com
Patrick J. Brickman (*pro hac vice to be filed*)
pbrickman@tzlegal.com
**TYCKO & ZAVAREEI LLP**
2515 Jay Ave, Ste First Floor
Cleveland, OH 44113
Telephone: (216) 423-6599

*Counsel for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**ABDULKADER JABBAN**, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

CSAA Insurance Exchange, Mobilitas Insurance Company of Arizona, and DOES 1-100,

Defendants.

Case No.:

Judge: To Be Assigned

**CLASS ACTION COMPLAINT**

1. **DECLARATORY & INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

Plaintiff ABDULKADER JABBAN ("Plaintiff"), individually and on behalf of the proposed Class, brings the following class action complaint against CSAA Insurance Exchange ("CSAA"), Mobilitas Insurance Company of Arizona ("Mobilitas"), and DOES 1-100 (collectively "Defendants").

# TABLE OF CONTENTS

I. INTRODUCTION……………………………………………...……………………3

II. JURISDICTION & VENUE…………………………………………………………5

III. PARTIES……………………………………………………………………...……...6

IV. CSAA'S LIABILITY BASED ON ALTER EGO, DIRECT PARTICIPATION, AND AGENCY……………………………………………………………………………..8

V. FACTUAL BACKGROUND……………………………………………….................…10

a. California Law Requires and Sets Minimum Coverage Levels in All Insurance Contracts…………………………………………………..…………...10

b. Defendants Engineer a Business Model to Evade California's TNC Insurance Mandates……………………………………………………………………11

c. The Mandatory TNC Insurance Framework Under California Law…..………..…...14

d. Defendants' Failure to Meet These Minimum Coverage Requirements …………...19

e. Plaintiff Jabban's Experience…………………………………………….....24

VI. CLASS ACTION ALLEGATIONS……………………………………………...26

VII. CAUSES OF ACTION……………………………………………………………...30

a. First Cause of Action – Declaratory & Injunctive Relief………………………….....30

VIII. PRAYER FOR RELIEF………………………………………………………...…..32

IX. DEMAND FOR JURY TRIAL……………………………………………………..34

## INTRODUCTION

1. This class action challenges a systemic and unlawful insurance claims-handling scheme conceived and implemented by Defendants to evade their core coverage obligations to rideshare drivers in California. When a rideshare driver is injured by an uninsured or underinsured motorist, California law mandates that the commercial insurance policy provided by the Transportation Network Company ("TNC") serve as the primary source of compensation. This mandatory Uninsured/Underinsured Motorist ("UM/UIM") coverage is a cornerstone of the state's public safety framework, intended to provide a seamless and immediate source of compensation for injured TNC drivers.

2. Instead of heeding the State of California's clear regulatory warning about the importance of UM/UIM coverage for TNC drivers and eventual mandate to address critical safety shortcomings in the TNC system[1], Defendants chose to exacerbate the crisis by issuing an insurance product that unequivocally failed to meet the specific laws designed to address the issue.

3. Defendants have engineered policy language and implemented a uniform claims-handling protocol designed to systematically and unlawfully deny or refuse to properly investigate and evaluate every UM/UIM claim submitted by an injured driver. This is accomplished through a single, integrated scheme with two interlocking components designed to unlawfully shift and evade Defendants' primary coverage obligations.

4. Crucially, this scheme deprives every injured driver of a fundamental right under California law: a prompt, fair, and primary claims investigation. The moment a UM/UIM claim is

[1] This unlawful scheme was implemented despite the fact that California's own expert regulators—the Department of Insurance ("CDI") and the Public Utilities Commission ("CPUC")—had already completed a formal, data-driven study at the end of 2017 confirming that Uninsured/Underinsured Motorist (UM/UIM) coverage is an "essential component" of TNC insurance precisely because it covers the most severe accidents. Cal. Dep't of Ins. & Cal. Pub. Utils. Comm'n, Joint Study of Transp. Network Co. (TNC) Ins. Coverage Requirements in Cal. at 5, 30 tbl.3.10 (Dec. 31, 2017) [hereinafter 2017 CDI/CPUC Study]. Accessible at: https://www.insurance.ca.gov/0400-news/0200-studies-reports/upload/TNC_REPORT_AS_OF_010518.pdf. (last accessed June 10, 2026). More alarmingly, the regulators' data revealed that, even under the then-existing legal framework, the TNC insurance system was already failing to compensate victims of uninsured or underinsured motorists for nearly a quarter (23.58%) of their total financial losses.[1] *Id.* at 30 tbl.3.10.

opened, Defendants execute a blind, automated protocol: they refuse to accept or review medical bills and instead direct the claimant to submit those bills to the OAI insurer for payment. Rather than independently evaluating an insured's economic damages to determine the 'all sums' owed, Defendants uniformly refuse to conduct any investigation whatsoever, unlawfully abdicating their primary investigative duties and forcing drivers into the restrictive OAI system.

5. For claims occurring prior to January 1, 2026,[2] the first component of this unified scheme was to wrongfully assert that the UM/UIM coverage is 'secondary' or "excess" to a driver's personal auto insurance. Defendants unlawfully refused to process claims until the injured driver first sought and obtained a formal denial from their personal insurer, creating improper delays and shifting the burden of coverage in contravention of state law.

6. The second component—which Defendants enforce against all claims regardless of the date of occurrence—is to weaponize a separate, driver-protective insurance benefit—Occupational Accident Insurance ("OAI")—to categorically deny all claims for economic damages, such as medical expenses and lost wages, under their UM/UIM policy. Crucially, this OAI diversion is not merely a dispute over the calculation of economic damages; it is a *de facto* and continuing violation of the statutory primacy mandate itself. By forcing claimants to seek recovery from the OAI system first, Defendants are unlawfully treating their mandatory UM/UIM coverage as secondary or excess to the OAI policy, in direct violation of Public Utilities Code § 5433.

7. California Insurance Code § 11580.2 requires UM/UIM policies to cover "all sums" an insured is legally entitled to recover. Defendants' uniform practice of refusing to even consider paying for a driver's medical bills or lost income under their UM/UIM policy directly violates this mandate and creates an unlawful coverage gap, depriving injured drivers of the primary, comprehensive insurance benefits mandated by law.

8. This 'Day-One Abdication' protocol is a rigid, automated corporate mandate that

---

[2] January 1, 2026, is the effective date of Senate Bill 371 ("SB 371"), which amended the California Public Utilities Code to adjust mandatory UM/UIM coverage limits and confirm TNC's sole responsibility to maintain UM/UIM coverage. As detailed in Section V(D), *infra*, Defendants used this statutory amendment to superficially modify their primacy protocols while preserving their underlying refusal to investigate economic damages.

transcends the January 1, 2026, statutory changes. While Defendants modified their vocabulary regarding 'primacy' for claims occurring after that date, the mechanical process by which they refuse to investigate economic damages—including the automated claims software workflows, standardized rejection templates, and internal adjuster directives—remains identical for all claims throughout the Class Period. The procedural injury inflicted on a driver in 2025 is mechanically indistinguishable from the injury inflicted on a UM/UIM claimant driver in 2026.

9. The central injury shared by every member of the Class is their uniform subjection to this single, unlawful insurance contract, which deprives them of the seamless, primary, and comprehensive coverage mandated by California law.

10. This scheme is not the product of isolated mistakes; it is the result of standardized, uniformly-applied claims protocols that are codified in Defendants' illegal policy provisions. Defendants' scheme and practice violate California Insurance Code § 11580.2, Business and Professions Code § 7455, and Public Utilities Code § 5433.

11. Because Defendants have acted and refused to act on grounds that apply generally to the entire class of driver-claimants, Plaintiff seeks declaratory and injunctive relief on behalf of the class pursuant to Federal Rule of Civil Procedure 23(b)(2). Plaintiff requests a judicial declaration that Defendants' challenged scheme is unlawful, and a permanent injunction compelling Defendants to conform that scheme and its implementing policy to the requirements of California law.

## JURISDICTION AND VENUE

12. This Court has original jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the Class contains more than 100 members, members of the Class reside in California and are therefore diverse from Defendant Mobilitas (a corporation registered in Arizona), and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Because Plaintiff seeks class-wide declaratory and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2), the amount in controversy is measured by the value of the object of the litigation, including the cost to Defendants of complying with the requested injunction. The aggregate cost to Defendants to cease their unlawful protocols, dismantle their automated diversion workflows,

and conduct lawful, primary claims investigations into the economic damages of all Class Members throughout California will exceed $5,000,000.

13. The Court has personal jurisdiction over Defendants because both Defendants have significant minimum contacts with California, and/or they otherwise intentionally availed themselves of the laws and markets of California through marketing, advertising, and the issuance of insurance policies in California, including the policy at-issue. The claims asserted herein also arise from Defendants' contacts with California. This Court's exercise of jurisdiction over Defendants is permissible under traditional notions of fair play and substantial justice.

14. Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391(b)(1) because both Defendants are subject to personal jurisdiction in this District; both Defendants regularly conduct substantial business in this District; both Defendants maintain physical offices within this District; Defendant CSAA maintains its corporate headquarters in this District; and many Class Members reside in this District.

15. Venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's and the Putative Class's claims occurred within this District, including, but not limited to, the creation of the insurance policies at issue, and the creation and implementation of the specific insurance claim handling procedures which evidence the illegal and unlawful nature of Defendants' insurance policies.

## PARTIES

### Plaintiff Abdulkader Jabban

16. Plaintiff Abdulkader Jabban ("Plaintiff") is, and at all times mentioned herein was, a resident of the County of San Diego, State of California. Plaintiff was insured under a Mobilitas policy providing UM/UIM coverage while operating as a driver for Lyft, Inc. when he suffered injuries in an auto accident caused by an uninsured motorist while transporting a passenger; and has made a claim for UM/UIM benefits under the Mobilitas policy. As such, Plaintiff is a member of the proposed California Driver Injunctive Relief Class.

**Defendant CSAA Insurance Exchange**

17. Defendant CSAA Insurance Exchange ("CSAA"), acting as the parent, principal, and architect of the scheme implemented alongside its subsidiary Mobilitas, is an insurance company incorporated in California offering automobile, homeowners, and other lines of insurance in 23 states and the District of Columbia.

18. Defendant CSAA has its principal place of business and headquarters located at 3055 Oak Road, Walnut Creek, CA 94597.

19. Plaintiff alleges that, at all times relevant herein, Defendant CSAA conducted business in the State of California and in the County of Contra Costa, and within this judicial district.

**Defendant Mobilitas Insurance Company of Arizona**

20. Defendant Mobilitas Insurance Company of Arizona ("Mobilitas") is a commercial insurance company incorporated in Arizona and is a wholly owned subsidiary of Defendant CSAA.

21. Defendant Mobilitas has its principal place of business and headquarters located at 5353 West Bell Road, Glendale, AZ 85308. Defendant Mobilitas also maintains a California office located at 3055 Oak Road, Walnut Creek, CA 94597, which is the headquarters of CSAA, and lists a mailing address with the California Department of Insurance of P.O. Box 23392, Oakland, CA 94623.[3]

22. Beginning on October 1, 2022, and at all times relevant to this action, Defendant Mobilitas issued a commercial insurance policy providing coverage to Lyft's drivers throughout California. Defendant Mobilitas issued, and continues to issue, this policy as a non-admitted surplus lines carrier, and thus is not subject to regulation by the California Department of Insurance as it relates to this policy.

23. Plaintiff alleges that, at all times relevant herein, Defendant Mobilitas conducted business in the State of California and in the County of Contra Costa, and within this judicial district.

---

[3] *See* https://mobilitasinsurance.com/privacy/ (Mobilitas Insurance Company Privacy Policy Version Dated July 14, 2025 - last accessed June 10, 2026). *See also* https://interactive.web.insurance.ca.gov/companyprofile/companyprofile?event=companyProfile&doFunction=getCompanyProfile&eid=116198 (California Department of Insurance Company Profile - last accessed June 10, 2026).

24. Throughout the entirety of the applicable policy period wherein Mobilitas was the named insurer to the subject policy of insurance issued to Lyft, Mobilitas sent 100% of the premiums it received under the Lyft policy directly to CSAA. In turn, CSAA accepted and assumed 100% of the covered risks under the written policy.[4]

## CSAA'S LIABILITY BASED ON ALTER EGO, DIRECT PARTICIPATION, AND AGENCY

25. Defendant CSAA is liable for the unlawful conduct alleged herein under at least three independent legal theories. First, as detailed below, Defendant Mobilitas has acted as the agent, instrumentality, and alter ego of Defendant CSAA, such that the corporate form should be disregarded. Second, CSAA is liable as a direct participant in the tortious conduct, as it conceived, directed, and implemented the unlawful insurance scheme. Third, CSAA is vicariously liable as the principal for the acts of its agent, Mobilitas, which were committed within the scope of the agency relationship.

***Alter Ego Liability***

26. At all times relevant herein, and as further detailed below, upon information and belief, CSAA and Mobilitas have such a unity of interest and ownership that their separate corporate personalities no longer in fact exist. Adherence to the fiction of separate corporate existence would sanction a fraud, promote injustice, and permit an abuse of the corporate privilege by shielding CSAA from liability for the unlawful scheme it designed and profits from. This unity of interest is evidenced by, among other things:

a. An inter-company reinsurance agreement, wherein Mobilitas sends 100% of its earned premium directly to CSAA, and, in return, CSAA accepts and assumes 100% of Mobilitas' covered risks. As a result, Mobilitas lacks any independent risk-bearing capacity for the

---

[4] *See* Report of Examination of the CSAA Insurance Exchange as of December 31, 2023 (available at https://www.insurance.ca.gov/0250-insurers/0300-insurers/0400-reports-examination/upload/CSAA-Insurance-Exchange-2023-Report-of-Examination.pdf) (last accessed June 10, 2026).

handling of claims under Defendants' commercial insurance policy.

b. As Mobilitas sends all insurance premiums to CSAA, Mobilitas is grossly undercapitalized in light of its vast risk exposure in the California TNC insurance market.

c. Mobilitas and CSAA share nearly every facet of their corporate infrastructures, including corporate offices, the use of CSAA employees to handle Mobilitas claims, the use of CSAA-controlled email servers (csaa.com) for Mobilitas's claims-related communications, and the sharing of executive officers (pursuant to the most recent official filings with the California Secretary of State, CSAA and Mobilitas share the same Chief Executive Officer (Michael Zukerman), Chief Financial Officer (Andrea Hecht), and Secretary (Katherine Evans)).

d. CSAA oversees and directs both the overall business strategy and the day-to-day operations of Mobilitas.

***Direct Participation Liability***

27. CSAA actively participated, and continues to participate, in the tortious conduct. The unlawful insurance scheme was conceived, directed, and implemented by CSAA for its own corporate benefit. CSAA directly architected the unfair and fraudulent business model; and directly participated in the intentional misrepresentations by engineering the unlawful insurance product, directing the issuance of policies that misrepresented the scope of coverage, and exercising operational control over all aspects of the administration of the policy, including claims handling. CSAA committed and continues to commit its own wrongful acts as both the mastermind of the scheme and primary enforcer of the insurance policy.

28. Specifically, the relevant claims manual, the standard operating procedures mandating OAI diversion, and the automated claims software workflows utilized by Mobilitas were authored, approved, and mandated by CSAA personnel. CSAA designed the illegal policy language disclaiming primary UM/UIM coverage and required Mobilitas adjusters to utilize automated systems that prevent the investigation of economic damages. Because CSAA personnel actively directed and authorized these specific acts, CSAA is directly liable for the resulting injuries to Plaintiff and the Class.

***Agency***

29. At all relevant times, Mobilitas acted as the agent of its principal, CSAA, in the business of providing TNC insurance. CSAA manifested its consent for Mobilitas to act on its behalf and subject to its control by creating Mobilitas for this express purpose, installing its own executives as the officers of Mobilitas, directing Mobilitas's business strategy, and exercising operational control over key functions, including claims handling. All of the unlawful acts and omissions of Mobilitas alleged herein were committed within the scope of this agency relationship and in furtherance of CSAA's business objectives.

## FACTUAL BACKGROUND

### A. California Law Requires and Sets Minimum Coverage Levels in All Insurance Contracts

30. Under California law, "any ambiguity or uncertainty" in an insurance policy must be "construed strictly against the insurer and most liberally in favor of the insured."[5] California law additionally requires "every insurance policy will thus be read so as to provide the *minimum* coverage required by law even if the policy fails to do so."[6]

31. Insurance coverage for injuries caused by either an uninsured motorist or an underinsured motorist (together "UM/UIM coverage") is governed by the Uninsured Motorist Act, codified at Cal. Ins. Code § 11580.2 (the "UM Statute").

32. The purpose of the UIM Amendments is "to provide the insured with the same insurance protections he or she would have enjoyed had the tortfeasor carried liability limits equal to insured's underinsured motorist limits."[7]

33. Under California law, this statute – which is designed to protect injured individuals

---

[5] *Akkerman v. Grange Ins. Ass'n*, 525 F. Supp. 3d 1122, 1125 (E.D. Cal. 2021) (citing *Jarrett v. Allstate Ins. Co.*, 209 Cal. App. 2d 804 (1962) (citing *N.Y. Life Ins. Co. v. Hollender*, 38 Cal. 2d 73, 237 P.2d 510 (1951)).

[6] *Akkerman,* at 1125 (citing *Utah Prop. & Cas. Ins. Etc. Ass'n. v. United Servs. Auto. Ass'n*., 230 Cal.App.3d 1010, 1018 (Ct. App. 1991) (citing *Luberman's Mutual Casualty Co. v. Wyman*, 64 Cal.App.3d 252, 257, 134 Cal. Rptr. 318 (Ct. App. 1976)).

[7] 1 New Appleman California Insurance Law 2.28 (quoting *Viking Ins. Co. v. State Farm Mut. Auto. Ins. Co.* (1993) 17 Cal. App. 4th 540, 548).

from suffering for losses caused by another's financial irresponsibility – should be liberally construed in favor of coverage.[8]

**B. Defendants Engineer a Business Model to Evade California's TNC Insurance Mandates**

34. At all relevant times, Mobilitas issued a commercial automobile liability insurance policy to Lyft, Inc. that provided UM/UIM coverage for California drivers operating on the Lyft platform. This coverage is mandated to comply with the minimum requirements of California law.

35. Pursuant to California's Uninsured Motorist Statute, UM/UIM coverage must insure "for all sums within the limits that he, she, or they…shall be legally entitled to recover as damages for bodily injury or wrongful death from the owner or operator of an uninsured motor vehicle." *See* California Insurance Code § 11580.2(a)(1).

36. Operative beginning July 1, 2015, California Public Utilities Code § 5433 outlines the specific insurance requirements for Transportation Network Companies ("TNCs") and their participating drivers, including a mandate that insurance policies issued by TNC insurers afford primary coverage to TNC drivers for personal injury liability and UM/UIM when operating on their platforms.[9] [10]

37. In November 2020, in an effort to provide California's TNC drivers additional protections, California voters passed Proposition 22 (codified as §§ 7448-7467 of the California Business and Professions Code), which, among other things, required TNC's like Lyft to provide

---

[8] *See*, *e.g.*, *Oanh Thi Pham v. Allstate Ins. Co.*, 206 Cal. App. 3d 1193, 1198 (1988) (the Statute is "remedial in nature"; by mandating UM/UIM coverage, "the Legislature attempted to broaden the protection ... against negligent and financially irresponsible motorists"; and as a result "[t]he legislation should be liberally construed to effect this goal." (citing/quoting *Inter-Insurance Exchange v. Lopez*, 238 Cal.App.2d 441, 443 (1965); *Firemen's Ins. Co. v. Diskin* (1967) 255 Cal.App.2d 502; *Security Nat. Ins. Co. v. Hand* (1973) 31 Cal.App.3d 227, 233) (internal marks and citations omitted). *See also*, e.g., 11 CR3d 158, 162; *Mercury Ins. Co. v. Enterprise Rent-A-Car Co. of Los Angeles* (2000) 80 CA 4th 41, 48, 95 CR2d 222, 227 ("In interpreting the UM statutes, courts temper the general rule of strict construction of statutes").

[9] California Public Utilities Code § 5433 has since been amended to separate required insurance coverage amounts by "period" of rideshare use. Despite these amendments, the requirement that the TNC policy provide primary coverage for both third-party liability and UM/UIM coverage remains.

[10] At the time of the filing of this Complaint, California Senate Bill 371 ("SB 371") has been signed into law and, as of January 1, 2026, reduced the UM/UIM coverage limit mandated by CPUC § 5433(b)(2) from $1,000,000 per incident to $60,000 per individual, and $300,000 per incident.

drivers operating on their platforms with occupational accident insurance ("OAI") to cover medical expenses and lost income resulting from injuries sustained while operating vehicles for the TNC, regardless of fault.

38. Proposition 22 specifically addressed the interplay between the new mandatory OAI policy and the pre-existing mandatory commercial UM/UIM policy, extending the workers' compensation offset generally applicable to UM/UIM policies found in California Insurance Code § 11580.2(h)(1), to include payments made by an OAI carrier. *See* BPC § 7455(e).

39. The legislative purpose behind Proposition 22's OAI policy requirement was to give TNC drivers similar (if not limited) benefits as traditional employees would enjoy under California's no-fault workers' compensation laws, while still maintaining the drivers' independent contractor statuses.

40. On October 1, 2020, Defendant CSAA formed and launched Defendant Mobilitas as a direct subsidiary of CSAA for the *express purpose* of entering the commercial insurance space, and, specifically, as an insurer for the burgeoning TNC market.

41. In anticipation of the passage of Proposition 22, Defendant CSAA devised a business strategy to win and retain Lyft's commercial auto insurance business through Mobilitas by creating a single, integrated scheme with two reinforcing components. The first component was to wrongfully assert that the UM/UIM coverage is secondary to a driver's personal auto insurance. The second, inseparable component was to rely on the new OAI policy to handle all claims for economic damages, thereby unlawfully treating the UM/UIM coverage as secondary and excess to the OAI policy.

42. Defendants' illegal and rigidly enforced policy terms and claims-handling procedures dictate that Mobilitas's UM/UIM coverage is secondary to the TNC drivers' personal insurance, and unlawfully secondary to the OAI policy, limiting UM/UIM coverage exclusively to general damages (non-economic losses). Pursuant to this practice, Mobilitas claims adjusters consistently and categorically refuse to review, consider, or provide payment for *any* economic damages including, but not limited to: a) past and future medical expenses, including those not paid by the OAI policy or

those reflecting the full value of the medical services as determined under California tort law;[11] b) past and future lost wages; and c) loss of future earning capacity.

43. This categorical refusal to evaluate economic damages is executed at the very inception of the claim. As a matter of uniform corporate policy, the moment a UM/UIM claim is opened, Mobilitas adjusters are directed to refuse to accept medical billing records and instead instruct the claimant to submit all such bills to the OAI administrator. This automatic diversion occurs before Mobilitas conducts any independent review of the bills, before any determination of fault or total damages is made, and regardless of whether the claimant will ultimately incur medical expenses that exceed the OAI fee schedule. By reflexively directing the claimant to a third-party OAI administrator on day one, Mobilitas systematically abdicates its non-delegable duty to conduct a primary claims investigation.

44. This practice is applied uniformly to all UM/UIM claimants, regardless of the terms or limitations of the separate OAI policy which, by its own policy terms, diverges from established standards for California tort law damages and artificially restricts the amount and time period for which benefits can be claimed.[12] As a result, injured driver insureds who submit claims are systematically and intentionally denied the comprehensive and primary UM/UIM benefits to which they are statutorily entitled.

45. In addition, CSAA created and directs - and Mobilitas employs and mandates – standard policy provisions, claims protocols, and practices which intentionally misrepresent

---

[11] In a California tort action, an injured plaintiff can recover the lesser of (1) the amount paid to or incurred by medical providers or (2) the reasonable value of the services. *See Howell v. Hamilton Meats & Provisions, Inc.*, 52 Cal. 4th 541 (2011). Plaintiffs without health insurance (or those who choose to treat outside of their health insurance network) may submit their unreduced lien medical bills as evidence of “reasonable value”. *See Pebley v. Santa Clara Organics, LLC, et al.*, 22 Cal.App.5th 1266 (2018).

[12] The OAI policy applicable to Lyft’s driver’s claims places caps and restrictions on the recovery of many elements of economic damages, including, but not limited to, a 66.6% cap on claimed lost wages payable for only 104 weeks, and a 104-week expiration for medical benefits with requirement that treatment begin within 90 days of injury. This policy is secondary to claimant’s own health insurance, such that any medical balances incurred through lien medical treatment must be re-billed and processed by the medical providers to the claimant’s health insurer, before the OAI policy will consider payment for any coinsurance balance.

Mobilitas's coverage priority under California law, to the extreme detriment of their insured drivers. Specifically, in contravention of both California Public Utilities Code § 5433 and public policy which mandate that UM/UIM coverage afforded to TNC drivers be *primary*, Mobilitas's insurance policy terms and claims practices nefariously and unequivocally misrepresent that the UM/UIM coverage provided therein is *secondary* to both the Lyft driver's personal UM/UIM policy and OAI policy. The result is either 1) the transfer of the UM/UIM claim and insuring risk from Mobilitas to the driver's personal insurer; 2) delay in processing the Mobilitas UM/UIM claim if the personal insurer then denies coverage; or 3) in the event the personal insurer handles the UM/UIM claim, a reduction of Mobilitas's monetary claim exposure by the amount paid to the UM/UIM claimant by the personal insurer.

46. By implementing this insuring scheme, Defendants CSAA and Mobilitas punish TNC insureds by stripping away their lawfully entitled UM/UIM benefits based on the mere existence of an OAI policy - a safeguard put in place by Proposition 22 and meant to provide *additional* benefits and protections to TNC drivers. As a result, Defendants' actions not only blatantly violate established California law, but also defiantly fly in the face of public policy intended to provide protections to California's gig-economy workers.

**C. The Mandatory TNC Insurance Framework Under California Law**

47. The California Legislature has established a clear, multi-layered, and mandatory insurance framework to protect Transportation Network Company ("TNC") drivers, their passengers, and the public. This framework, codified in the Public Utilities Code, the Insurance Code, and the Business and Professions Code, dictates both the priority and the scope of required insurance coverages. Any insurance policy provisions that fail to comply with these interlocking mandates are unlawful and unenforceable.

48. ***The Primacy Mandate of the Public Utilities Code*:** California Public Utilities Code § 5433(b) explicitly mandates that for any accident occurring while a TNC driver has accepted a ride request or is transporting a passenger (known as Periods 2 and 3), the TNC's insurance **"shall be**

**primary."**[13] This primacy mandate is a non-negotiable directive that applies to the entire insurance product required by the section, including the mandatory Uninsured/Underinsured Motorist ("UM/UIM") coverage for drivers during Period 3. The Legislature's intent was to create a reliable, seamless, and immediate source of compensation for TNC drivers, placing the first and principal obligation to pay on the TNC's commercial insurer.

49. ***The Express Prohibition on Preconditions*****:** To enforce this primacy and eliminate any potential for insurer evasion, the Legislature enacted Public Utilities Code § 5433(d). This provision contains an unambiguous prohibition against the exact claims-handling tactics employed by Mobilitas:

> "Coverage under a transportation network company insurance policy shall not be dependent on a personal automobile insurance policy first denying a claim, nor shall a personal automobile insurance policy be required to first deny a claim."

This provision protects all UM/UIM claimants from unlawful delays in the handling of their claims, as well as preventing the primary TNC insurer from unlawfully deferring their primary coverage responsibility to the claimant's personal insurer.

50. ***The "All Sums" Mandate of the Insurance Code*****:** Separate from the primacy requirement, California Insurance Code § 11580.2 mandates that all UM/UIM policies provide coverage for **"all sums which [the insured] shall be legally entitled to recover as damages"** from an at-fault uninsured or underinsured motorist. This includes, without limitation, both economic damages (such as past and future medical expenses and lost wages) and non-economic damages (such as pain and suffering). Any policy provision that purports to unilaterally carve out or exclude a category of legally recoverable damages is void as against public policy and unlawful.

51. ***The Duty to Conduct a Primary Claims Investigation:*** Inherent in the statutory mandates of primacy and 'all sums' coverage is the insurer's non-delegable duty to conduct a prompt, fair, and comprehensive investigation of the insured's claim. A primary insurer cannot lawfully

---

[13] As of January 1, 2026, the language of California Public Utilities Code § 5433 has been modified. Despite the modification of language, § 5433 has *always* mandated that TNC UM/UIM coverage be primary.

determine its coverage obligations without first investigating and evaluating the full extent of the insured's economic and non-economic damages. Defendants' policy of categorically refusing to evaluate economic damages for OAI-eligible drivers is a systemic breach of this foundational investigative duty.

52. ***The OAI Mandate Did Not Alter Pre-Existing Duties*****:** As discussed *supra*, in 2020, California voters passed Proposition 22, which required TNCs to provide drivers with Occupational Accident Insurance ("OAI") for certain on-the-job medical expenses and disability benefits. Critically, nothing in Proposition 22 or its implementing statutes (codified at Cal. Bus. & Prof. Code § 7451, *et seq.*) amended or diluted the separate, pre-existing, and controlling duties of a TNC insurer to provide **primary** UM/UIM coverage to drivers for **all sums** available as tort damages pursuant to the Public Utilities Code and the Insurance Code.

53. ***The Optional Nature of the OAI Benefit and Its Unlawful Weaponization by Defendants:*** The statutory framework governing Occupational Accident Insurance ("OAI") is clear: Business and Professions Code § 7455 mandates only that a TNC "carries, provides, or otherwise **makes available**" OAI coverage. This language confers a right of access to the driver, not a mandate of use. A driver retains the absolute right to seek recovery for their injuries directly from the primary UM/UIM carrier under California tort law without ever making a claim on the optional OAI policy.

54. Despite the optional nature of this benefit, Defendants have unlawfully weaponized it. They have coercively transformed a benefit that was merely "made available" into a **mandatory precondition** for receiving any economic damages under the primary UM/UIM policy. This is a violation of the driver's statutory right of choice and is a cornerstone of Defendants' scheme. Instead of conducting their own prompt, fair, and thorough investigation of their insureds' UM/UIM claims as required by law, Defendants unlawfully abdicate their primary duties and force their insureds into the separate, and optional, OAI system, thereby illegally subordinating their UM/UIM coverage to an excess, secondary position behind the OAI policy.

55. ***The "Paid vs. Payable" Limitation of BPC § 7455(e) and the Unlawful Creation of the Coverage Gap***: A cornerstone of Defendants' unlawful scheme is their willful violation of the

specific statutory provision that governs the interplay between Occupational Accident Insurance ("OAI") and Uninsured/Underinsured Motorist ("UM/UIM") coverage: California Business and Professions Code § 7455(e).

56. While California law generally limits insurance offsets to benefits actually paid to an insured, Defendants have built a business model predicated on the fallacy that they are entitled to an offset for all OAI benefits that are merely *available* or *payable*. This position is in direct contravention of the plain language of the controlling statute. Business and Professions Code § 7455(e) states:

> "any benefits ***provided*** to an app-based driver…shall be considered amounts payable under a workers' compensation law…for the purpose of determining amounts payable under [the UM/UIM statute]…" (emphasis added).

57. This statute's deliberate use of the past-tense verb "provided" is a critical and dispositive limitation. It means that only OAI benefits that have already been furnished, supplied, or actually paid to a driver can be considered for an offset against UM/UIM benefits.[14] The statute does not refer to benefits that are "available," "eligible," or "potentially payable."

58. Business and Professions Code § 7455(e) creates a limited, two-step legal pathway for an offset: First, as a factual prerequisite, OAI benefits must have been "provided." Second, if and only if that prerequisite is met, those specific, already-paid amounts are then legally "considered amounts payable" under the UM/UIM statute. Any benefit not actually "provided"—such as the substantial "gap" between the reasonable value of an insured's medical care and the discounted amount paid by the OAI carrier under its restrictive fee schedule—never satisfies the first step and therefore can never be lawfully offset.

59. This narrow construction is confirmed by comparing BPC § 7455(e) to the traditional workers' compensation offset provision of the UM statute, Insurance Code § 11580.2(h)(1). That provision explicitly allows a broader offset for amounts "paid and the present value of all amounts

---

[14] Section 7455(e) creates a statutory equivalence between OAI benefits and workers' compensation benefits for a specific, limited purpose: "for the purpose of determining amounts payable under any insurance." This language is directed at offset calculations—ensuring that a UM/UIM claimant does not receive duplicative recovery for the same damages covered by OAI. It does not, by its terms, import the entirety of workers' compensation procedural machinery.

payable." The Legislature's choice not to use this well-established "paid and payable" language in the OAI context, and to instead use the more restrictive term "provided," is a clear expression of its intent to create a narrower offset right for OAI. Mobilitas had no authority to unilaterally grant itself the broader offset that the Legislature deliberately withheld.

60. Despite this clear statutory limitation, Defendants have a uniform policy and practice of violating BPC § 7455(e). They interpret their own unlawful policy language—"entitled to receive payment"—to mean that the mere *eligibility* for OAI benefits extinguishes Defendants' duty to pay for any economic damages. This illegal interpretation transforms a narrowly permitted, end-of-claim offset for amounts provided into a total, front-end exclusion for all amounts merely available, thereby manufacturing a systematic and unlawful coverage gap at the direct expense of their insureds.

61. ***The Department of Insurance's Guidance on the OAI Offset:*** Following the passage of Proposition 22, and in advance of its effective date, the California Department of Insurance ("CDI")—the state agency charged with enforcing insurance laws—issued a formal Notice on February 3, 2021, to provide guidance to all insurers on the law's proper implementation. The February 3, 2021 CDI Notice explicitly addressed the interplay between the new OAI benefits and the pre-existing UM/UIM statute.

62. In its official guidance, the CDI clarified that the statutory mechanism was an end-of-claim offset, not a front-end exclusion. The Notice states that Proposition 22 "provides that certain disability benefits required by Proposition 22 ***must be deducted from uninsured motorist coverage recoveries*** by the TNC driver."[15] (emphasis added).

63. This language confirms that an insurer's duty is to first determine the full measure of an insured's damages under the UM/UIM policy, and only *then* deduct or offset the amounts paid by an OAI carrier to prevent a double recovery. The Notice provides no support for, and directly contradicts, a practice of excluding an entire category of damages from coverage at the outset. Despite

---

[15] Cal. Dep't of Ins., Notice re: Implementation of Insurance Provisions of Proposition 22 (Feb. 3, 2021) (https://www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/upload/Notice-Implementation-of-Insurance-Provisions-of-Proposition-22.pdf) (last accessed June 10, 2026)

this clear regulatory guidance, Defendants designed and implemented a policy and claims-handling protocol based on an unlawful total exclusion of economic damages, in direct defiance of both the statute and the CDI's interpretation.

64. ***The TNC Insurance Statutes Provide the Exclusive and Controlling Law by Deliberately Overriding the General Insurance Framework*****:** Under California insurance law, the term "primary" is a legal term of art. The default statutory scheme for resolving priority of coverage disputes between multiple auto insurance policies is set forth in the framework of Insurance Code § 11580.9. Recognizing that these priority rules can lead to significant disputes and delays in payment to injured victims, the Legislature made a conscious and deliberate public policy decision to create a special, simplified rule for the TNC context.

65. To leave no doubt as to the absolute and exclusive nature of the TNC insurer's obligations, the Legislature enacted Public Utilities Code § 5443 as a statutory "supremacy clause," which explicitly **overrides** the complex default rules of the Insurance Code. The statute states:

> **"Notwithstanding Section 11580.9 of the Insurance Code, or any other law affecting whether one or more policies of insurance that may apply with respect to an occurrence is primary or excess, this article determines the obligations under insurance policies issued to transportation network companies…"**

66. The legal effect of this statute is to create a hermetically sealed legal framework. The Legislature deliberately replaced the complex waterfall of § 11580.9 with a simple, absolute, and non-negotiable command for TNC insurance, set forth in Public Utilities Code § 5433(b): the TNC's insurance **"shall be primary."**

67. Mobilitas is therefore statutorily prohibited from looking to an insured driver's personal auto policy (the very issue governed by the overridden § 11580.9) or an OAI policy to subordinate or excuse its own primary duties. The TNC article alone controls.

### D. Defendants' Failure to Meet These Minimum Coverage Requirements

68. In the present matter, as alleged herein, Defendants failed to meet these minimum coverage requirements.

69. ***The Unlawful "Reduction" Clause*****:** Mobilitas's California Uninsured Motorists

Coverage – Bodily Injury policy endorsement contains an explicit "reduction" clause that directly violates the statutory command that TNC insurance "shall be primary." The clause illegally purports to reduce Mobilitas's own primary policy limits based on the existence of a driver's personal insurance. Specifically, Section D – Limits of Insurance, Paragraph 4 states:

> "If Uninsured Motorists Coverage available for anyone "occupying" the covered "auto" provides less than the Limit of Insurance for this coverage shown on the Declarations of this policy, **then our Limit of Insurance for Uninsured Motorists Coverage will be reduced by the amount of that other insurance**, including any deductibles or self-insured amounts." (emphasis added).

70. This reduction mechanism is the functional equivalent of an excess clause and is tailored to specifically align with California's excess UM/UIM "offset" and non-stacking rules. The policy pays second, and only provides the differential amount of coverage, reinforcing its secondary status.

71. ***The Unlawful "Other Insurance" Clause*****:** Mobilitas's California Uninsured Motorists Coverage – Bodily Injury policy endorsement similarly contains a detailed "Other Insurance" clause which eliminates any possibility the coverage could be construed as providing primary UM/UIM. Specifically, Section E – Changes in Conditions, Paragraph 4 states:

> "4. **Other Insurance** in the Business Auto Coverage Form is replaced by the following:
>
> a. If there is Uninsured Motorists Coverage available to anyone "occupying" the covered "auto" which provides at least the Limit of Insurance for Uninsured Motorists Coverage shown on the Declarations of this policy, then this coverage shall not apply.
> b. If there is Uninsured Motorists Coverage available to anyone "occupying" the covered "auto" which provides less than the Limit of Insurance for Uninsured Motorists Coverage shown on the Declarations of this policy, then this policy shall provide coverage on an excess basis.
> c. If there is no other valid and collectible Uninsured Motorists Coverage for anyone "occupying" the covered "auto", then this policy shall provide coverage on a primary basis.
> d. The maximum recovery under all Coverage Forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any Coverage Form or policy providing coverage on either a primary or excess basis. Our share is the proportion that our Limit of Insurance bears to the total of all applicable limits of insurance covering on the same level of priority."

72. ***The Unlawful Imposition of Preconditions:*** In service of their efforts to avoid their primary coverage obligations, Defendants have consistently enforced these illegal policy terms by

refusing to process a claim until the insured first seeks and obtains a formal denial of coverage from their personal auto insurer, contrary to the mandates of California law.

73. ***The "All Sums" Mandate of the Insurance Code*: ** Separate from the primacy requirement, California Insurance Code § 11580.2 mandates that all UM/UIM policies provide coverage for **"all sums which [the insured] shall be legally entitled to recover as damages"** from an at-fault uninsured or underinsured motorist. This includes, without limitation, both economic damages (such as past and future medical expenses and lost wages) and non-economic damages (such as pain and suffering). Any policy provision that unilaterally excludes a category of legally recoverable damages (as Defendants do here) is void as against public policy.

74. ***The Illegally Expanded "Inurement" Clause*: ** Mobilitas's policy language improperly expands the narrow statutory inurement clause found in Insurance Code § 11580.2(c)(4) - which applies *only* to workers' compensation carriers – to also include OAI and disability carriers, creating a contractual exclusion that is far broader than the law permits.

Insurance Code § 11580.2(c)(4) states:

> "The insurance coverage provided for in this section does not apply either as primary or as excess coverage..(i)n any instance where it would inure directly or indirectly to the benefit of any workers' compensation carrier or to any person qualified as a self-insurer under any workers' compensation law, or directly to the benefit of the United States, or any state or any political subdivision thereof."

Mobilitas's policy states:

> "This insurance does not apply to any of the following:….3. The direct or indirect benefit of any insurer under any workers' compensation, **occupational accident**, **disability benefits** or similar law, or directly to the benefit of the United States, or any state or any political subdivision thereof." (emphasis added).

75. This unilateral revision of statute is unlawful. The canon of statutory construction *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) applies here. Both the Legislature, in drafting Proposition 22, and the Department of Insurance, in its subsequent clarifying Notice, addressed only one point of intersection between OAI and the UM/UIM statute: the § 11580.2(h) offset. Their silence on all other provisions of § 11580.2, including the § 11580.2(c)(4) inurement clause, is dispositive. It confirms that the Legislature did

not intend for OAI to be treated as a wholesale substitute for workers' compensation throughout the statute. Defendants had no authority to rewrite the law to create a broader exclusion than the one enacted by the Legislature.

76. ***The Unlawful Exclusion of Economic Damages*****:** Mobilitas's California Uninsured Motorists Coverage – Bodily Injury policy endorsement purports to entirely exclude coverage for economic damages if an insured is eligible for Occupational Accident Insurance ("OAI"), in direct violation of the "all sums" mandate of Insurance Code § 11580.2 and the primacy mandate of Public Utilities Code § 5433. Specifically, Section D – Limits of Insurance, Paragraph 3 states:

> "We will not pay for any element of "loss" if a person is entitled to receive payment for the same element of "loss" under any workers' compensation, occupational accident, disability benefits or similar law.
>
> With respect to "bodily injury" to a "Rideshare Driver", ***we will not pay for any amounts recoverable under this policy if the "Rideshare Driver" has received or is entitled to payment under any:***
>
> a. ***Occupational accident insurance***; or
> b. Driver injury protection insurance." (emphasis added).

77. This provision illegally transforms a potential end-of-claim *offset* into a total, front-end *exclusion* of coverage for all economic damages. The exclusionary language in Section (D)(3) of Mobilitas's policy endorsement is not merely contrary to general public policy; it is a direct and specific violation of Business and Professions Code § 7455(e). The policy states that Mobilitas will not pay for any economic loss if a person is "entitled to receive payment" for that loss under an OAI policy.

78. This "entitled to receive payment" standard is also far broader than what the law permits. As detailed above, BPC § 7455(e) narrowly limits the UM/UIM offset to only those OAI benefits that have actually been "provided" to the driver. By replacing the Legislature's restrictive "provided" standard with its own expansive "entitled to receive payment" standard, Mobilitas unilaterally and illegally rewrote the law.

79. Despite clear statutory limitation, Defendants have a uniform policy and practice of violating BPC § 7455(e). They interpret their own unlawful policy language—"entitled to receive payment"—to mean that the mere *eligibility* for OAI benefits extinguishes Defendants' duties to provide a primary coverage investigation into, nor pay for, any economic damages. This illegal

interpretation transforms a narrowly permitted, end-of-claim offset for amounts provided into a total, front-end exclusion for all amounts merely available, thereby manufacturing a systematic and unlawful coverage gap at the direct expense of their insureds. These practices violate the clear mandate of Proposition 22, the implementing and interpreting regulations promulgated by the California Department of Insurance[16], and a common sense reading of the statutory scheme.

80. ***The "Day-One" Abdication Protocol:*** Effective January 1, 2026, the California Legislature amended Public Utilities Code § 5433 via Senate Bill 371. In response to this statutory change, Defendants modified their claims-handling protocols for claims occurring on or after January 1, 2026, ceasing their practice of requiring personal auto policy denials or delaying claims based on the existence of personal UM/UIM coverage.

81. However, this modification was a superficial cure. While Defendants ceased requiring personal auto policy denials for post-2026 claims, they merely shifted the target of their primacy evasion. Defendants deliberately maintained the second component of their scheme (OAI weaponization). For all claims occurring on or after January 1, 2026, Defendants continue to execute their 'Day-One Abdication' protocol, automatically directing claimants to submit medical bills to the OAI administrator and categorically refusing to evaluate economic damages under the UM/UIM policy. By forcing claimants to exhaust the OAI system first, Defendants continue to unlawfully treat their UM/UIM coverage as secondary or excess to the OAI policy. Thus, Defendants have never acted as the primary insurer. Not prior to January 1, 2026, and not now. The core procedural deprivation—the refusal to conduct a lawful, primary claims investigation—remains continuous and ongoing for all Class Members.

82. This automated diversion is a fixed, non-discretionary feature of Defendants' claims-handling architecture. The software scripts, template correspondence, and internal directives that triggered the refusal to evaluate Plaintiff Jabban's medical bills related to his 2025 injury are the exact

---

[16] Cal. Dep't of Ins., Notice re: Implementation of Insurance Provisions of Proposition 22 (Feb. 3, 2021) (https://www.insurance.ca.gov/0250-insurers/0300-insurers/0200-bulletins/bulletin-notices-commiss-opinion/upload/Notice-Implementation-of-Insurance-Provisions-of-Proposition-22.pdf) (last accessed June 10, 2026).

same mechanical protocols used by Mobilitas for claims occurring on or after January 1, 2026. This protocol is executed regardless of the ‘primacy’ label Defendants assign to the claim or the specific statutory limits in effect, ensuring that the same automated workflow results in the same systematic abdication of the duty to investigate for every Class Member.

83. ***The "One-Way Street" and Absence of a True-Up Mechanism*****:** Defendants operate this Day-One diversion as a permanent, one-way street. Mobilitas maintains no mechanism, protocol, or procedure for conducting a "true-up" or secondary review of a claimant's economic damages after the OAI process concludes. Once a claimant is directed to the OAI claims administrator, Mobilitas functionally closes its investigative file on economic damages and never reopens it to evaluate the remaining unpaid balances. By permanently abandoning the claim on day one with no procedural avenue for a back-end review, Defendants' protocol cannot be defended as a lawful "offset" calculation; it is a total, permanent abdication of their primary duty to investigate and pay.

84. This ‘one-way street’ is codified in the very language of Defendants' policy. *See* P. 80, *supra*. By unlawfully substituting the statutory ‘provided’ standard with an expansive ‘entitled to receive’ standard, Defendants have designed a system that triggers a total exclusion of coverage based on a claimant's mere theoretical eligibility for OAI benefits. Because the exclusion is triggered by ‘entitlement’ rather than actual payment, Defendants' protocol contains no requirement—and Mobilitas maintains no mechanism—to ever revisit a claim to reconcile the ‘gap’ between OAI's restrictive payments and the insured's actual damages. The ‘entitled to receive’ language is the textual mechanism by which Defendants ensure that once a claim is diverted, it is never ‘trued-up’ or reviewed again. By permanently abandoning the claim on day one with no procedural avenue for a back-end review, Defendants' protocol is not a lawful "offset" calculation; it is a total, permanent abdication of the duty to investigate and pay.

**E. Plaintiff Jabban's Experience**

85. Plaintiff Abdulkader Jabban's experience is a direct manifestation of the uniform, automated claims-handling scheme inflicted on all Class Members.

86. On or about October 29, 2025, Plaintiff Jabban, while working as a Lyft driver and insured under the Mobilitas UM/UIM policy, was involved in a collision in San Diego, California, when another vehicle rear-ended his vehicle. As a direct result of the collision, Plaintiff Jabban suffered bodily injuries and retained counsel to represent him.

87. Plaintiff Jabban notified Lyft of the incident. Consequently, claims were opened with both Defendant Mobilitas and Blue Star Claims LLC ("Blue Star"), the claims administrator for Lyft's OAI policy.

88. In response to Plaintiff Jabban's claim, Mobilitas executed its standard, automated protocol. On March 24, 2026, Mobilitas issued its uniform claims-handling directives, instructing Plaintiff Jabban that: (1) he was required to submit a UM claim to his personal insurer and exhaust that coverage prior to seeking UM coverage through Mobilitas; and (2) his economic damages for medical bills and lost wages would be handled exclusively by Occupational Accident Insurance through Blue Star.

89. Consistent with Defendants' "one-way street" protocol, Mobilitas has never advised Plaintiff Jabban that his file would remain open for a "true-up" or secondary review of his unpaid medical balances after Blue Star's involvement concludes. Mobilitas's diversion of his economic damages was total and permanent.

90. At Mobilitas's express direction, and as a direct result of its refusal to consider his economic damages under the primary UM/UIM policy, Plaintiff Jabban was directed to submit his medical bills to Blue Star. Blue Star, in turn, reimburses claimants pursuant to a restrictive workers' compensation fee schedule, paying only a fraction of the billed amount or the reasonable value of the services rendered.

91. Unlike traditional statutory workers' compensation—which strictly prohibits medical providers from balance-billing injured workers—the OAI policy provides no such statutory shield. Consequently, Defendants' diversion strips Class Members of critical legal protections, exposing Plaintiff Jabban and the Class to personal legal liability for the substantial remaining balances owed to their medical providers.

92. To date, Mobilitas continues to refuse to handle Plaintiff Jabban's claim as primary, and has failed to conduct any independent investigation into the value of Plaintiff Jabban's medical expenses or lost wages.

93. Because his claim arose prior to January 1, 2026, Plaintiff Jabban's injury is the direct product of both components of Defendants' unified scheme operating in concert: his claim was wrongfully subordinated to his personal insurer, and his claim for economic damages was wrongfully subordinated to the OAI system without any primary investigation.

94. Because Defendants operate their 'Day-One Abdication' as a permanent, one-way street with no mechanism for a back-end review, Plaintiff Jabban's UM/UIM claim remains permanently deprived of a lawful, primary investigation. So long as Defendants maintain this unlawful claims-handling architecture, Plaintiff Jabban and the Class Members will continue to suffer the permanent, unredressed deprivation of the primary investigative duties owed to their claims under California law.

95. Defendant Mobilitas's refusal to act as a primary source of UM/UIM benefits—executed through its continuous OAI diversion protocol for all claims, and its personal auto exhaustion requirement for pre-2026 claims—reflects the rigidly enforced, automated claims-handling architecture that Mobilitas deploys for all injured Lyft drivers in California

## CLASS ACTION ALLEGATIONS

96. Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23. This action is well-suited for class treatment because it challenges a uniform, centralized, and systematically applied scheme of unlawful conduct. The legality of Defendants' standardized policy forms is the central issue of the litigation. This common question can be answered for all class members in a single stroke, making class resolution not only superior but essential for the fair and efficient adjudication of this controversy.

97. Plaintiff brings this action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, individually and on behalf of the following Class, of which Plaintiff is a member, which is defined as follows:

**California Driver Injunctive Relief Class ("The Class")**:
*(Represented by Plaintiff Jabban)*
All persons who, through the date of class certification, while operating as a 'Rideshare Driver' on the Lyft, Inc. platform in California, made a claim for Uninsured or Underinsured Motorist ('UM/UIM') benefits under a commercial automobile insurance policy issued by Defendant Mobilitas Insurance Company of Arizona, related to an incident occurring on or after October 1, 2022.

98. Excluded from the Class are Defendants, their officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

99. Plaintiff reserves the right to redefine the Class as appropriate based on discovery and specific theories of liability.

100. **Numerosity**: Upon information and belief, the members of the Class are so numerous that joinder of all of them is impracticable.

101. The exact number of the members of the Class are unknown to Plaintiff at this time and can be determined through appropriate discovery. However, given that Defendants have insured Lyft in California since at least October 1, 2022, it is realistic to infer that class numbers will number in the thousands, such that the Class is so numerous that joinder of all members is impracticable. The disposition of the claims in a class action will provide substantial benefits to the parties and the Court.

102. **Ascertainability**: The proposed Class is precisely defined and clearly ascertainable by reference to objective criteria. Defendants maintain detailed electronic records of every UM/UIM claim made under their policy. Membership can be determined by cross-referencing these records with the time period during which the unlawful Mobilitas policy was in effect.

103. **Typicality**: Plaintiff's claims are typical of the Class because the unifying injury—the deprivation of a lawful, primary claims investigation—is the result of the same automated 'Day-One Abdication' protocol. Although the statutory limits and 'primacy' labels shifted on January 1, 2026, the mechanical process used to divert Plaintiff Jabban's medical bills is identical in every respect to the process applied to post-2026 claimants. Because the same automated workflow, the same software

triggers, and the same rejection templates cause the same procedural injury to all Class Members regardless of the date of their accident, Plaintiff's claims are typical of the entire Class through the date of certification.

104. Plaintiff will fairly and adequately represent and protect the interests of the Class in that Plaintiff has no interests antagonistic to any member of the Class.

105. **Adequacy**: Plaintiff is qualified to and will fairly and adequately protect the interests of the members of the Class with whom he is similarly situated, as demonstrated herein. Plaintiff acknowledges that he has an obligation to make known to the Court any relationships, conflicts, or differences with any Class Member.

106. Plaintiff's interests in this matter are not directly or irrevocably antagonistic to the interests of the members of the Class.

107. Plaintiff will vigorously pursue the claims of the members of the Class.

108. Plaintiff has retained counsel experienced and competent in class action litigation and California insurance law. Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement.

109. Plaintiff's counsel will vigorously pursue this matter.

110. Plaintiff's counsel will assert, protect and otherwise represent the members of the Class.

111. **Commonality:** There are numerous questions of law and fact common to the Class, the resolution of which will drive the litigation. These include:

a. Whether Defendants' uniform protocol of directing claimants to submit medical bills to an OAI insurer—rather than accepting and reviewing them under the primary policy—unlawfully deprives Class Members of a primary claims investigation;

b. Whether Defendants' implementation of a single, integrated claims-handling scheme, designed to subordinate coverage and exclude economic damages, is unlawful;

c. Whether the first component of the scheme—wrongfully treating the

mandatory UM/UIM coverage as secondary and requiring denials from personal auto insurers for claims occurring prior to January 1, 2026 — violates California Public Utilities Code § 5433;

d. Whether the second and continuous component of the scheme—categorically refusing to pay for economic damages for OAI-eligible drivers by unlawfully treating the UM/UIM coverage as secondary to OAI policies—violates the primacy mandate of California Public Utilities Code § 5433, California Insurance Code § 11580.2, and Business & Professions Code § 7455(e);

e. Whether the entire scheme, in its unified operation, results in a failure to provide the seamless, primary coverage mandated by California law; and

f. Whether Defendants should be enjoined from continuing the challenged scheme alleged herein.

112. **Judicial Economy and Avoidance of Inconsistent Rulings:** In the absence of a class action, courts across California would be inundated with hundreds of individual lawsuits all raising the identical legal challenges to Defendants' uniform policy and practices. This would result in an enormous waste of judicial resources and create the serious risk of inconsistent or varying adjudications on the same questions of statutory interpretation, establishing incompatible standards of conduct for Defendants and unequal rights among similarly situated insureds.

113. **Manageability:** This action is eminently manageable as a class action. The proposed Class is clearly defined, and the questions of law to be determined are based on common proof of Defendants' standardized conduct and policy language.

114. **Propriety of Injunctive and Declaratory Relief (Fed. R. Civ. P. 23(b)(2)):** This action is particularly appropriate for certification under Rule 23(b)(2). Defendants have acted and refused to act on grounds that apply generally to the Class—namely, by implementing standardized, unlawful claims-handling protocols based on illegal policy language. As a result, final injunctive relief and corresponding declaratory relief are appropriate with respect to the Class as a whole to compel Defendants' compliance with California law. The unifying injury suffered by every Class Member is the uniform deprivation of a lawful, primary claims investigation. Whether executed by

forcing the Class Member to first exhaust a personal auto policy, or by directing a driver to submit bills to an OAI administrator on day one, the procedural deprivation is the same. Because this investigative abdication is inflicted upon all Class Members identically, injunctive relief is the precise and appropriate remedy.

## FIRST CAUSE OF ACTION

### DECLARATORY & INJUNCTIVE RELIEF

### (ON BEHALF OF PLAINTIFF & THE CLASS AGAINST ALL DEFENDANTS)

115. Plaintiff and the Class re-allege and incorporate by reference each preceding paragraph as though fully set forth herein.

116. Pursuant to 28 U.S.C. § 2201, this Court is authorized to declare the rights and other legal relations of interested parties in the case of an actual controversy. At all relevant times, Defendants knew or should have known that its conduct as alleged herein violated California law.

117. An actual and present controversy has arisen and now exists between Plaintiff and the Class, on the one hand, and Defendants, on the other, concerning their respective rights and duties under Mobilitas's insurance policy and relevant California law.

118. As alleged herein, Plaintiff and the Class contend that, prior to January 1, 2026,[17] Mobilitas's UM/UIM coverage must be primary; that Mobilitas is precluded by California law from requiring a coverage denial from an insured driver's personal auto policy as a precondition to coverage; that Mobilitas's duty to process UM/UIM claims cannot be delayed or excused by the existence of personal UM/UIM coverage or an OAI policy; and that for all claims throughout the Class Period, Defendants are obligated to pay for all legally recoverable damages, including economic damages, irrespective of a driver's eligibility for OAI benefits, and cannot lawfully abdicate their primary status by forcing claimants into the OAI system.

[17] Pursuant to the passage of SB371, California Public Utilities Code §5433 updated its language, effective January 1, 2026, to implement a reduction of mandatory UM/UIM limits and ensure that the responsibility of maintaining UM/UIM insurance was solely that of the TNC. Upon information and belief, Defendants contend that, as a result, the UM/UIM primacy requirement only became effective beginning January 1, 2026. Plaintiff disagrees.

119. Defendants, by their uniform conduct and policy provisions, contend the opposite.[18]

120. A judicial declaration is necessary and appropriate at this time so that the parties may ascertain their rights and duties under the policy and California law. Such a declaration is necessary to prevent Defendants from continuing their unlawful scheme which results in the wrongful denial and improper handling of UM/UIM benefits for Class Members, and to resolve the uncertainty for all Class Members insured under the unlawful policy. The risk of future harm under the unlawful policy is not speculative, but is a real and immediate threat to every member of the Class, creating a present and ongoing controversy ripe for judicial resolution.

121. Plaintiff, on behalf of the Class, therefore, seeks a single judicial declaration that Defendants' unified claims-handling scheme, as memorialized in the policy and implemented in practice, is unlawful, and which specifically declares that:

a. Defendants' practice of subordinating coverage by treating it as 'secondary' to personal auto policies for claims occurring prior to January 1, 2026, and Defendants' continuous scheme of subordinating coverage by treating it as 'secondary' to OAI policies for all claims throughout the Class Period, are predicated on illegal policy provisions that violate the primacy mandate of Public Utilities Code § 5433, the 'all sums' mandate of Insurance Code § 11580.2, and Business & Professions Code § 7455(e), and are therefore *void ab initio* and unenforceable;

b. The entire scheme, violates the exclusive and controlling nature of the TNC insurance article as established by Public Utilities Code § 5443; and

c. That for all claims throughout the Class Period, Defendants owe an affirmative, non-delegable duty to conduct a primary and comprehensive investigation of all

[18] Defendants contend that the amended language of CPUC § 5433 makes TNC UM/UIM insurance primary only for claims occurring on or after January 1, 2026. However, Defendants' post-2026 compliance is superficial. While they no longer formally require a coverage denial from a personal auto insurer, their position that they are not obligated to investigate or pay for economic damages when a driver is eligible for OAI benefits remains unchanged. Defendants continue to systematically direct claimants to the OAI system in lieu of a primary investigation for all UM/UIM claims occurring after January 1, 2026.

economic and non-economic damages prior to, and independent of, the application of any lawful offsets, and cannot lawfully abdicate this duty by directing claimants to the OAI system.

122. In addition to a declaration of rights, a permanent injunction is necessary to prohibit Defendants from continuing their unlawful claims-handling practices and to compel their future conduct to conform to the requirements of California law. Absent injunctive relief, Plaintiff and the Class will continue to suffer irreparable harm through the uniform and ongoing deprivation of a lawful, primary claims investigation, as Defendants continue to systematically abdicate their non-delegable investigative duties.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, respectfully requests the following relief:

- An order certifying this matter as a class action under Fed. R. Civ. P. 23(b)(2) with Plaintiff as Class Representative, and designating Plaintiff's counsel as Class Counsel;
- A judicial declaration that that Defendants' unified claims-handling scheme, as memorialized in the policy and implemented in practice, is unlawful, and which specifically declares that:

  a. Defendants' practice of subordinating coverage by treating it as 'secondary' to personal auto policies for claims occurring prior to January 1, 2026, and Defendants' continuous scheme of subordinating coverage by treating it as 'secondary' to OAI policies for all claims throughout the Class Period, are predicated on illegal policy provisions that violate the primacy mandate of Public Utilities Code § 5433, the 'all sums' mandate of Insurance Code § 11580.2, and Business & Professions Code § 7455(e), and are therefore *void ab initio* and unenforceable;

  b. The entire scheme, by relying on other insurance policies to diminish its mandatory duties, violates the exclusive and controlling nature of the TNC insurance article

as established by Public Utilities Code § 5443; and

c. That for all claims throughout the Class Period, Defendants owe an affirmative, non-delegable duty to conduct a primary and comprehensive investigation of all economic and non-economic damages prior to, and independent of, the application of any lawful offsets, and cannot lawfully abdicate this duty by directing claimants to the OAI system.

- A permanent injunction enjoining Defendants, their agents, and employees from continuing the unlawful claims-handling practices alleged herein, and affirmatively requiring Defendants to:

  a. Treat their UM/UIM coverage as primary for all claims, regardless of the date of occurrence;

  b. Cease the automated "Day-One Abdication" protocol, including the practice of refusing to accept medical billing records or directing claimants to submit bills to OAI administrators in lieu of a primary investigation;

  c. Conduct a prompt, fair, and comprehensive first-dollar claims investigation into all economic and non-economic damages for every UM/UIM claim;

  d. Evaluate and pay all legally recoverable damages without requiring claimants to first exhaust coverage under personal auto insurance policies;

  e. Implement a formal "true-up" mechanism and secondary review protocol to ensure that any lawful OAI offsets are calculated based on actual payments provided, rather than mere theoretical "entitlement"; and

  f. Dismantle all automated claims software workflows, standardized rejection templates, and internal adjuster directives that facilitate the categorical exclusion of economic damages.

- An award of Plaintiff's reasonable attorneys' fees and costs of suit pursuant to California Code of Civil Procedure § 1021.5 and other applicable law; and

- All other and further declaratory and equitable relief as the Court deems necessary, just, and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the Class, demands a jury trial on all issues so triable.

Dated: June 10, 2026

Respectfully submitted,

**MADAR LAW CORPORATION**

By: /s/ Alex S. Madar

Alex S. Madar, Esq.
*alex@madarlaw.net*
**MADAR LAW CORPORATION**
630 1st Ave, Ste 219
San Diego, CA 92101
Telephone: (858) 299-5879

Andrea R. Gold (*pro hac vice to be filed*)
*agold@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, Northwest, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900

Frank A. Bartela (*pro hac vice to be filed*)
*fbartela@tzlegal.com*
Patrick J. Brickman (*pro hac vice to be filed*)
*pbrickman@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
2515 Jay Ave, Ste First Floor
Cleveland, OH 44113
Telephone: (216) 423-6599

Michael A. VanGalio, Esq.
*michael@vangaliolaw.com*
**VANGALIO LAW CORP**
4203 Genessee Ave. Ste 103 Box 163
San Diego, CA 92117
Telephone: (805) 720-3938

*Attorneys for Plaintiff and the Proposed Class*

## APPENDIX A – STATUTORY LANGUAGE

**Text of**
**Cal Ins. Code § 11580.2(a)(1)**

(a)(1) No policy of bodily injury liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle, except for policies that provide insurance in the Republic of Mexico issued or delivered in this state by nonadmitted Mexican insurers, shall be issued or delivered in this state to the owner or operator of a motor vehicle, or shall be issued or delivered by any insurer licensed in this state upon any motor vehicle then principally used or principally garaged in this state, unless the policy contains, or has added to it by endorsement, a provision with coverage limits at least equal to the limits specified in subdivision (m) and in no case less than the financial responsibility requirements specified in Section 16056 of the Vehicle Code insuring the insured, the insured's heirs or legal representative for all sums within the limits that he, she, or they, as the case may be, shall be legally entitled to recover as damages for bodily injury or wrongful death from the owner or operator of an uninsured motor vehicle…

**Full Text of**
**Cal Ins. Code § 11580.2(c)(4)**

(c) The insurance coverage provided for in this section does not apply either as primary or as excess coverage:

(4) In any instance where it would inure directly or indirectly to the benefit of any workers' compensation carrier or to any person qualified as a self-insurer under any workers' compensation law, or directly to the benefit of the United States, or any state or any political subdivision thereof.

**Full Text of**
**Cal Ins. Code § 11580.2(h)(1)**

An insured entitled to recovery under the uninsured motorist endorsement or coverage shall be reimbursed within the conditions stated herein without being required to sign any release or waiver of rights to which he or she may be entitled under any other insurance coverage applicable; nor shall payment under this section to the insured be delayed or made contingent upon the decisions as to liability or distribution of loss costs under other bodily injury liability insurance or any bond applicable to the accident. Any loss payable under the terms of the uninsured motorist endorsement or coverage to or for any person may be reduced:

(1) By the amount paid and the present value of all amounts payable to him or her, his or her executor, administrator, heirs, or legal representative under any workers' compensation law, exclusive of nonoccupational disability benefits.

**Full Text of**
**Cal Public Utilities Code § 5433**

(a) A transportation network company and any participating driver shall maintain transportation network company insurance as provided in this section.

(b) The following requirements shall apply to transportation network company insurance from the moment a participating driver accepts a ride request on the transportation network company's online-enabled application or platform until the driver completes the transaction on the online-enabled application or platform or until the ride is complete, whichever is later:

(1) Transportation network company insurance shall be primary and in the amount of one million dollars ($1,000,000) for death, personal injury, and property damage. The requirements for the coverage required by this subdivision may be satisfied by any of the following:

(A) Transportation network company insurance maintained by a participating driver.

(B) Transportation network company insurance maintained by a transportation network company.

(C) Any combination of subparagraphs (A) and (B).

(2) Transportation network company insurance coverage provided under this subdivision shall also provide for uninsured motorist coverage and underinsured motorist coverage in the amount of one million dollars ($1,000,000) from the moment a passenger enters the vehicle of a participating driver until the passenger exits the vehicle. The policy may also provide this coverage during any other time period, if requested by a participating driver relative to insurance maintained by the driver.

(3) The insurer, in the case of insurance coverage provided under this subdivision, shall have the duty to defend and indemnify the insured.

(4) A transportation network company may meet its obligations under this subdivision through a policy obtained by a participating driver pursuant to subparagraph (A) or (C) of paragraph (1) only if the transportation network company verifies that the policy is maintained by the driver and is specifically written to cover the driver's use of a vehicle in connection with a transportation network company's online-enabled application or platform.

(c) The following requirements shall apply to transportation network company insurance from the moment a participating driver logs on to the transportation network company's online-enabled

application or platform until the driver accepts a request to transport a passenger, and from the moment the driver completes the transaction on the online-enabled application or platform or the ride is complete, whichever is later, until the driver either accepts another ride request on the online-enabled application or platform or logs off the online-enabled application or platform:

(1) Transportation network company insurance shall be primary and in the amount of at least fifty thousand dollars ($50,000) for death and personal injury per person, one hundred thousand dollars ($100,000) for death and personal injury per incident, and thirty thousand dollars ($30,000) for property damage. The requirements for the coverage required by this paragraph may be satisfied by any of the following:

(A) Transportation network company insurance maintained by a participating driver.

(B) Transportation network company insurance maintained by a transportation network company that provides coverage in the event a participating driver's insurance policy under subparagraph (A) has ceased to exist or has been canceled, or the participating driver does not otherwise maintain transportation network company insurance pursuant to this subdivision.

(C) Any combination of subparagraphs (A) and (B).

(2) A transportation network company shall also maintain insurance coverage that provides excess coverage insuring the transportation network company and the driver in the amount of at least two hundred thousand dollars ($200,000) per occurrence to cover any liability arising from a participating driver using a vehicle in connection with a transportation network company's online-enabled application or platform within the time periods specified in this subdivision, which liability exceeds the required coverage limits in paragraph (1).

(3) The insurer providing insurance coverage under this subdivision shall be the only insurer having the duty to defend any liability claim arising from an accident occurring within the time periods specified in this subdivision.

(4) A transportation network company may meet its obligations under this subdivision through a policy obtained by a participating driver pursuant to subparagraph (A) or (C) of paragraph (1) only if the transportation network company verifies that the policy is maintained by the driver and is specifically written to cover the driver's use of a vehicle in connection with a transportation network company's online-enabled application or platform.

(d) Coverage under a transportation network company insurance policy shall not be dependent on a personal automobile insurance policy first denying a claim nor shall a personal automobile insurance policy be required to first deny a claim.

(e) In every instance where transportation network company insurance maintained by a

participating driver to fulfill the insurance obligations of this section has lapsed or ceased to exist, the transportation network company shall provide the coverage required by this section beginning with the first dollar of a claim.

(f) This article shall not limit the liability of a transportation network company arising out of an automobile accident involving a participating driver in any action for damages against a transportation network company for an amount above the required insurance coverage.

(g) This section shall become operative on July 1, 2015

**Full Text of**
**Cal Public Utilities Code § 5443**

Notwithstanding Section 11580.9 of the Insurance Code, or any other law affecting whether one or more policies of insurance that may apply with respect to an occurrence is primary or excess, this article determines the obligations under insurance policies issued to transportation network companies and, if applicable, drivers using a vehicle in connection with a transportation network company's online-enabled application or platform.

**Full Text of**
**Cal Bus. & Prof. Code § 7455**

No network company shall operate in California for more than 90 days unless the network company carries, provides, or otherwise makes available the following insurance coverage:

(a) For the benefit of app-based drivers, occupational accident insurance to cover medical expenses and lost income resulting from injuries suffered while the app-based driver is online with a network company's online-enabled application or platform. Policies shall at a minimum provide the following:

(1) Coverage for medical expenses incurred, up to at least one million dollars ($1,000,000).

(2)(A) Disability payments equal to 66 percent of the app-based driver's average weekly earnings from all network companies as of the date of injury, with minimum and maximum weekly payment rates to be determined in accordance with subdivision (a) of Section 4453 of the Labor Code for up to the first 104 weeks following the injury.

(B) "Average weekly earnings" means the app-based driver's total earnings from all network companies during the 28 days prior to the covered accident divided by four.

(b) For the benefit of spouses, children, or other dependents of app-based drivers, accidental death insurance for injuries suffered by an app-based driver while the app-based driver is online with the network company's online-enabled application or platform that result in death. For purposes of this subdivision, burial expenses and death benefits shall be determined in accordance with Section 4701 and Section 4702 of the Labor Code.

(c) For the purposes of this section, "online" means the time when an app-based driver is utilizing a network company's online-enabled application or platform and can receive requests for rideshare services or delivery services from the network company, or during engaged time.

(d) Occupational accident insurance or accidental death insurance under subdivisions (a) and (b) shall not be required to cover an accident that occurs while online but outside of engaged time where the injured app-based driver is in engaged time on one or more other network company platforms or where the app-based driver is engaged in personal activities. If an accident is covered by occupational accident insurance or accidental death insurance maintained by more than one network company, the insurer of the network company against whom a claim is filed is entitled to contribution for the pro-rata share of coverage attributable to one or more other network companies up to the coverages and limits in subdivisions (a) and (b).

(e) Any benefits provided to an app-based driver under subdivision (a) or (b) of this section shall be considered amounts payable under a worker's compensation law or disability benefit for the

purpose of determining amounts payable under any insurance provided under Article 2 (commencing with Section 11580) of Chapter 1 of Part 3 of Division 2 of the Insurance Code.

(f)(1) For the benefit of the public, a DNC as defined in Section 7463 shall maintain automobile liability insurance of at least one million dollars ($1,000,000) per occurrence to compensate third parties for injuries or losses proximately caused by the operation of an automobile by an app-based driver during engaged time in instances where the automobile is not otherwise covered by a policy that complies with subdivision (b) of Section 11580.1 of the Insurance Code.

(2) For the benefit of the public, a TNC as defined in Section 7463 shall maintain liability insurance policies as required by Article 7 (commencing with Section 5430) of Chapter 8 of Division 2 of the Public Utilities Code.

(3) For the benefit of the public, a TCP as defined in Section 7463 shall maintain liability insurance policies as required by Article 4 (commencing with Section 5391) of Chapter 8 of Division 2 of the Public Utilities Code.

# APPENDIX B – EXCERPTS FROM MOBILITAS POLICY

## EXCERPTS FROM UM/UIM ENDORSEMENT “CALIFORNIA UNINSURED MOTORISTS COVERAGE – BODILY INJURY”

**A. Coverage**

1. We will pay all sums the “insured” is legally entitled to recover as compensatory damages from the owner or driver of an “uninsured motor vehicle”. The damages must result from “bodily injury” sustained by the “insured” caused by an “accident”. The owner’s or driver’s liability for these damages must result from the ownership, maintenance or use of the “uninsured motor vehicle”.

2. We will pay only after the limits of liability under any liability bonds or policies have been exhausted by payment of judgments or settlements.

**B. Who Is An Insured**

If the Named Insured is designated in the Declarations as:

2. A partnership, limited liability company, corporation or any other form of organization, then the following are “insureds”:

   a. Anyone “occupying” a covered “auto” or a temporary substitute for a covered “auto”.
   b. Anyone for damages he or she is entitled to recover because of “bodily injury” sustained by another “insured”.

**C. Exclusions**

This insurance does not apply to any of the following:

3. The direct or indirect benefit of any insurer or self-insurer under any workers' compensation, occupational accident, disability benefits or similar law or to the direct benefit of the United States, a state or its political subdivisions.

**D. Limit of Insurance**

3. No one will be entitled to receive duplicate payments for the same elements of "loss" under this coverage and any Liability Coverage form or Uninsured Motorists Coverage endorsement or Medical Payments Coverage endorsement attached to this Coverage Part.

We will not make a duplicate payment under this coverage for any element of "loss" for which payment has been made by or for anyone who is legally responsible.

We will not pay for any element of "loss" if a person is entitled to receive payment for the same element of "loss" under any workers' compensation, occupational accident, disability benefits or similar law.

With respect to “bodily injury” to a “Rideshare Driver”, we will not pay for any amounts recoverable under this policy if the “Rideshare Driver” has received or is entitled to payment under any:

a. Occupational accident insurance; or
b. Driver injury protection insurance.

4. If Uninsured Motorists Coverage available for anyone "occupying" the covered "auto" provides less than the Limit of Insurance for this coverage shown on the Declarations of this policy, then our Limit of Insurance for Uninsured Motorists Coverage will be reduced by the amount of that other insurance, including any deductibles or self-insured amounts.

**E. Changes in Conditions**

The Conditions are changed for California Uninsured Motorists Coverage – Bodily Injury as follows:

4. **Other Insurance** in the Business Auto Coverage Form is replaced by the following:

a. If there is Uninsured Motorists Coverage available to anyone "occupying" the covered "auto" which provides at least the Limit of Insurance for Uninsured Motorists Coverage shown on the Declarations of this policy, then this coverage shall not apply.

b. If there is Uninsured Motorists Coverage available to anyone "occupying" the covered "auto" which provides less than the Limit of Insurance for Uninsured Motorists Coverage shown on the Declarations of this policy, then this policy shall provide coverage on an excess basis.

c. If there is no other valid and collectible Uninsured Motorists Coverage for anyone "occupying" the covered "auto", then this policy shall provide coverage on a primary basis.

d. The maximum recovery under all Coverage Forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any Coverage Form or policy providing coverage on either a primary or excess basis. Our share is the proportion that our Limit of Insurance bears to the total of all applicable limits of insurance covering on the same level of priority.